CLAY HALLMAN, DERRICK MILLER, )
and CHRISTOPHER WILLIAMS, )
)
       Plaintiffs, )
)
       v. )
)
RAGE, INC., and PIZZA HUT OF HICKORY )
NO.2, INC. )
       Defendants. )
                                      )

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The evidence in this case indicates that the manager of a Pizza Hut restaurant owned by Defendant Pizza Hut of Hickory No.2, Inc. ("Pizza Hut") intentionally discriminated against the plaintiffs by calling the police on them with no cause, and demanding that they first pay before receiving their food. The defendants have failed to demonstrate the absence of any genuine issue as to any material fact relating to the plaintiffs' claims, and summary judgment should be denied.

## II. QUESTIONS PRESENTED

1. Have the defendants shown the absence of any genuine issue as to any material fact relating to the plaintiffs' claims of intentional discrimination?

2. Have the defendants demonstrated the absence of any genuine issue as to any material fact relating to the plaintiffs' claims of injury arising from the intentional discrimination against them by the defendants?



**3. Have the defendants demonstrated the absence of any genuine issue as to any material fact, relating to the plaintiffs claims of behavior by the defendants exhibiting reckless indifference to the plaintiffs' federally protected rights, such that the plaintiffs should receive an award punitive damages?**

### III. STATEMENT OF THE CASE

The plaintiffs filed their complaint on March 2, 1998, and brought their claims along with another group of plaintiffs alleging discrimination by the defendants in Cary, North Carolina. On May 8, 1998, the defendants initiated a motion to dismiss the claims of all plaintiffs. On July 27, 1998, the Court issued an order and judgment granting the defendants' motion to dismiss regarding the claims of the plaintiffs from Cary, but denied the motion in connection with the claims of the remaining plaintiffs. On May 10, 1998, the defendants initiated this Motion for Summary Judgment.

### IV. STATEMENT OF THE FACTS

The facts in this case center primarily around the testimony of the persons present at a Pizza Hut Restaurant in Hickory located at 2321 North Center Street, on March 2, 1995. Those persons are the plaintiffs, Clay Hallman, Derek Miller and Chris Williams, David Coats, Lisa Starnes, a waitress at the restaurant (then known as Lisa Smith), and Louis White, the manager. All of these persons have been deposed except Mrs. Starnes, who has submitted an affidavit.

The evidence before the Court will clearly demonstrate that the defendants fail to refute overwhelming facts which prove intentional discrimination by the defendants, injuries suffered by the plaintiffs which are cognizable under federal statutes, and the need for punitive damages.

**A. The Discrepancy between the Testimony of Louis White and all other Witnesses.**

All available witnesses present at the Pizza Hut on March 2, 1995, except Mr. White

2

agree on the following points of fact: that Mr. Coats, Mr. Hallman, Mr. Miller and Mr. Williams were co-workers at United/Armstrong Van Lines, and stopped for lunch at the Pizza Hut restaurant on March 2, 1995; that the group came into the restaurant behaving normally; and that the group was promptly seated by Mrs. Starnes, who also took the group's drink orders, and engaged in routine pleasant conversation with the group. Coats Deposition pp.14, 23; Hallman Deposition pp.14-15; Miller Deposition p.125; Starnes Affidavit ¶¶6, 7, and 21. Mr. White, on the other hand, is the only person present who recalls that the group of co-workers came into the Pizza Hut restaurant making loud noises and appearing to be very intoxicated, so much so that Mrs. Starnes allegedly commented to him about the group members possibly being drunk. White Deposition, pp.7, 25-27, 28, 35.

All witnesses other than Mr. White present at the Pizza Hut Restaurant on March 2, 1995 also commonly recall that Mrs. Starnes took food orders from the plaintiffs and Mr. Coats, and that after this part of the order was taken, the group waited a considerable period of time without receiving any food, but never left their table. Coats Dep. pp.14-15; Hallman Dep. p.20; Miller Dep. p.135; Williams Dep. pp.29, 61-62; Starnes Aff. ¶¶13, 14, and 15. Each witness except Mr. White also clearly remembers that the police were called on the group without provocation and without the group receiving any warning. Coats Dep. pp.14-15, 26, 39, 50; Hallman Dep. pp.22-23; Miller Dep. p.137; Williams Dep. p.29; Starnes Aff. ¶¶14, 15, and 19. Again, Mr. White's testimony differs sharply from all other witnesses: according to his version of events, the group continued to act "drunk and disorderly", left their table to physically confront and argue with Mr. White over beer, and was aware that a call was placed to the police regarding their behavior. White Dep. pp.7, 29-31, 32-33.

Yet another deviation between the testimony of Mr. White and all other witness relates to

3

what happened when the police arrived in the restaurant. On the one hand, every other witness has no doubt that the plaintiffs and Mr. Coats were still present when the police officers arrived at the table. Coats Dep. pp.14-15, 17, 19, 24-25, 26, 39-40, 41, 50; Hallman Dep. pp.22-26, 29-34; Miller Dep. pp.137-142; Williams Dep. pp. 29-31; Starnes Aff.¶¶15, 16, and 17. All other witness also recount, with minor variations in the telling, that the police officers and Mr. White approached the group's table to make a demand on the group to pay prior to eating or leave, and that this was the first interaction any of the group members had with Mr. White. Coats Dep. pp.14-15, 26; Hallman Dep. pp.22-23; Miller Dep. pp.138-139; Williams Dep. pp.29-31; Starnes Aff.¶¶16 and 17. The other witnesses, with the exception of Mr. Coats, also state in concert that the group paid for their pizza prior to receiving it, and ultimately received and ate it. Coats Dep. pp.16-19; Hallman Dep. pp 33-34; Miller Dep. p.142; Williams Dep. p.31; Starnes Aff.¶¶17, 18. On the other hand, Mr. White alone contends that the group left <u>before</u> the police officers arrived and that he and the officers never made any collective demand on the group. White Dep. pp.7, 31-33. Mr. White does not think that the group ever got their pizza before leaving, and flatly denies ever making a demand that the group pay before getting their pizza. White Dep. pp.31, 35.

The enormous differences in the statements of fact by Mr. White and the other witnesses calls the accuracy of his account into serious question.

**B.  Discrepancies between the testimony of Mr. White and Mrs. Starnes's Affidavit.**

In light of the evidence presented thus far, it is clear that there were conversations and actions that took place during the incident between Mr. White and Mrs. Starnes that Messrs. Coats, Hallman, Miller and Williams did not have any opportunity to see or hear. Scrutiny of the conflicting accounts given by Mr. White and Mrs. Starnes regarding these one-on-one

4

interactions is a crucial step in reviewing the facts in this case.

Mrs. Starnes remembers that from the time the plaintiffs and Mr. Coats came into the restaurant, Mr. White was extremely nervous, even though in her perception, the group was very polite and engaging. Starnes Aff.¶¶7 and 9. Mr. White was so agitated, according to Mrs. Starnes, that for a few moments she also became nervous. Starnes Aff.¶12. However, further interaction with the group quickly brought her back to her senses. Starnes Aff.¶12. As a result, Mrs. Starnes was very confused and surprised that Mr. White "overreacted" and instructed her to call the police to say that they were in the restaurant with "four suspicious men", even though the group had done nothing to deserve this description. Starnes Aff.¶¶13, 14, 18 and 19. Mrs. Starnes reluctantly followed her manager's directions. Starnes Aff.¶14.

Mr. White's accounting of events varies greatly from Mrs. Starnes's, as it does from most of the other witnesses' recollections regarding almost all other facts. As described above, he remembers that the plaintiffs and Mr. Coats were a drunken, rowdy crew who physically intimidated him in a dispute over beer. Mr. White also maintains that Mrs. Starnes also felt that the group had been drinking, in direct contradiction to her explicit sworn statement. White Dep. pp.27-28.

Combined with the other gaps described above between Mr. White's story and the factual recollections of others, these conflicting statements by him and Mrs. Starnes further undermine his credibility. At the same time, Mrs. Starnes's credibility is enhanced by the fact that her factual account of events aligns with others who witnessed them.

C.  **Discrepancies and Consistencies between and among the Testimony of Mr. Coats and the Plaintiffs.**

Different individuals attempting to bring back details of the same long-past occurrence

5

will inevitably remember certain aspects of the happening differently. While this reality does not explain the wide variations between the testimony of Mr. White and other witnesses, it does shed light on some of the discrepancies between and among the accounts of the plaintiffs and Mr. Coats.

In their Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defendants' Memo"), the defendants make every effort to highlight minor and somewhat irrelevant distinctions in the testimony of the plaintiffs and Mr. Coats, including who in the group did or did not order or consume beer, and whether the group complained to Mrs. Starnes about the delay, in receiving pizza. Defendants' Memo pp.3-5.

To the extent that there are natural differences in the recollection of the plaintiffs and Mr. Coats regarding the events which are now before the Court, those differences are easily explained and understood by a careful review of the testimony of the group. In addition, this review will also bring out critical information regarding which members of the group have likely given the most reliable testimony.

Mr. Williams and Mr. Hallman both remember the facts of the incident in a manner that is much more mutually consistent, and consistent with the accounts of others such as Mrs. Starnes, than the testimony of Mr. Coats and Mr. Miller. For example, both Mr. Hallman and Mr. Williams clearly and solidly recall one of the critical facts in this case, Mr. White's explanation of his decision to call the police as being motivated by the criminal actions of a group of previous black would-be customers. Hallman Dep. pp.22-23, 26-27, 82-84; Williams Dep. pp.30-31. In contrast, Mr. Coats and Mr. Miller cannot remember the comment. As stated above, Mr. Hallman, Mr. Miller, Mrs. Starnes and Mr. Williams all stated that Mr. White and the police together, in some combination, demanded that Mr. Coats and the plaintiffs pay before

6

getting their pizza, yet somehow Mr. Coats feels that they were instead asked to leave the restaurant, and received their pizza prior to paying. Furthermore, Mr. Hallman, Mr. Williams and Mrs. Starnes all vividly remember that the group left Mrs. Starnes a generous tip. Hallman Dep. p.53; Williams Dep. pp. 59-60; Starnes Aff.¶18. Nevertheless, Mr. Coats and Mr. Miller remember the group leaving no tip for Mrs. Starnes. Coats Dep. pp.16, pp.19-20; Miller Dep. p.143.

It is noteworthy that the facts as set forth by Mr. Hallman, Mr. Williams and Mrs. Starnes are congruent, even though they have had no relationship with one another before or since the March 2, 1995 incident, while in general the largest factual discrepancies exist between and among Mr. Hallman and Mr. Williams, and Mr. Miller and Mr. Coats, although they worked together before and after the incident. The strong implication, when viewed in conjunction with the credibility inferences evident from comparing Mrs. Starnes's and Mr. White's recollections as discussed above, is that the most reliable fact witnesses in this matter are Mr. Hallman, Mr. Williams, and Mrs. Starnes, just as the least credible witness is Mr. White. Further underscoring this point is that when read in the most full and broad context based on all of the evidence now before the Court, the recountings of the most credible witnesses reveal a much higher level of detail than those of the less reliable Mr. Miller and Mr. Coats, and the almost totally incredible Mr. White.

**D.   Purposeful Discrimination by the Defendants.**

On March 2, 1995 it is admitted by Pizza Hut that Louis White was employed as its manager. Defendants' Memo, Exhibit I, Affidavit of Richard I. Stephenson, Esq. The first evidence of his intentional discrimination was his inexplicable overreaction to the presence of the plaintiffs and Mr. Coats in the restaurant, as described by Mrs. Starnes, even though they

7

conducted themselves in a way that far exceeded common courtesy and decency. Next, he insisted on contacting the police and mischaracterizing the group as "suspicious", according to Mrs. Starnes. It is beyond doubt that the plaintiffs were treated differently than other Pizza Hut customers through the calling of the police and the prepayment demand, as Mrs. Starnes highlights in her sworn statements. Starnes Aff.¶16. Finally, there is explicit and credible testimony that he fully showed his discriminatory hand by blatantly explaining that he was penalizing the group, solely on the basis of their race and/or association with blacks, for the wrongful actions of other African-Americans.

In their Memorandum, the defendants seek to discount the discrimination suffered at their hands by the plaintiffs by asserting that Mr. Coats is not bringing claims along with the plaintiffs because he doesn't feel he was discriminated against. Defendants' Memo p.2 fn.2. Although the defendants refer to selected portions of Mr. Coats's deposition, they fail to provide the Court with the full picture as painted by Mr. Coats. In his descriptions of how "everyone" in the group wanted to see a lawyer because they felt they had suffered discrimination, and through his actions in actually joining the rest of the group in seeking legal counsel, Mr. Coats makes plain his view that the defendants' actions were racially discriminatory. Coats Dep. pp.9, 28, 44, 48, 55. In fact, Mr. Coats became angry after the first lawyer consulted by the group informed them that in his opinion they did not have a strong legal claim. Coats Dep. pp.36-37. In other testimony, Mr. Coats points to the true reasons that he dropped his pursuit of a lawsuit, which are that after receiving the lawyer's opinion he didn't feel he had a case, and that he switched jobs and fell out of touch with the plaintiffs. Coats Dep. pp.9-12, 37-38.

**E. Plaintiffs' Injuries.**

The plaintiffs have suffered clearly articulable damages caused by the defendants'

8

discriminatory conduct.

Mr. Hallman, in extensive testimony, discusses not only how humiliated and embarassed he felt about the incident at the time it occurred and afterward, but also spells out how it has changed his life. Hallman Dep. pp.57-67. He described the anguish of "being embarrassed as being the only white person at the table to be a witness of it firsthand, the discrimination by white--by the white people and that we're talking about onto everyone else and being associated with that on the opposite spectrum." Hallman Dep. p.66. He admits that he is "also paranoid about...getting discriminated against" and is "..more or less terrified for myself...see, I don't want to be considered a racist." Hallman Dep. p.60. Finally, he acknowledges that he "pay[s] attention to more things...than I used to" with regard to discriminatory conduct by others around him. Mr. Miller likewise describes embarrassment at the incident, that "[t]hey made it seem like we did something, you know...paying before we ate. We never had that happened [sic.] before, you know. You go anywhere now and you eat before you pay. I never had that happened [sic.]. Miller Dep. p. 159.

Mr. Williams also makes no secret of how he has suffered due to the discrimination he endured at the hands of the defendants. He explains that the incident was "...one of the most degrading things that happened to me in my life. Matter of fact that is the most degrading thing in my life". Williams Dep. p.41. He points out that "I never had the cops called on me or nothing like that...that was a scary moment and...I started thinking...that we are marked and that at any given time that if somebody give an officer...the go ahead...maybe I could be going to jail or I could be getting harassed for something I ain't done." His background also dictated how this incident affected him: "That's all I grew up around was, you know, white people...[a]ll my friends were white, you know, most of them and we spent the night at each other house and

9

played...but now I just--I think too much of it...it's like every time I feel that someone white is doing something to me its because I'm black, you know, and I never did used to feel that way." Williams Dep. pp.54-55.

While the issue of damages is ultimately one for the jury and judge to decide, there is ample evidence of how this incident impacted the plaintiffs in their feelings and behaviors.

## V. DISCUSSION

### A. Standard for Summary Judgment.

When making a summary judgment motion pursuant to Federal Rule of Civil Procedure 56 (c), the moving party must demonstrate the absence of any genuine issues as to any material facts in connection with the non-moving party's claims or allegations. Patterson v. McLean Credit Union, 39 F.3d 515, 518 (4th Cir. 1994). In viewing the evidence submitted in relation to a summary judgment motion:

> "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to by drawn in his favor." Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment."

Hairston v. Gainesville Sun Pub. Co., 9 F3d 913, 919 (11th Cir. 1993).

The evidence before the Court demonstrates that much more than simply genuine issues of fact exist, thereby making the defendants' motion futile.

### B. Defendants Have Failed to Show that no Genuine Issue Exists as to Facts Related to Purposeful Discrimination.

When bringing claims of racial discrimination under §§1981 and 2000a, a plaintiff must make out a *prima facie* case of discrimination. McDonnell Douglas v. Green, 411 U.S. 792, 802,

10

93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the plaintiff satisfies this requirement, then the defendant must rebut the plaintiff's showing through the presentation of evidence of a legitimate and non-discriminatory reason for the defendant's actions. Id. The plaintiff then has the burden of proving that the reason offered by the defendant is pretextual, and that the defendant is actually engaged in intentional discrimination. Id. At 804. More specifically, with regard to a §1981 claim:

> the plaintiff must show that (1) he or she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute; in this case, the making and enforcing of a contract.

Bellows v. Amoco Oil Co., 118 F.3d 268, 274 (7th Cir. 1997).

Under §2000a, the plaintiffs must show that the defendants: (1) owned and operated a restaurant affecting commerce; (2) owned and operated a restaurant that is a public accomodation; and (3) denied plaintiffs full and equal enjoyment of the restaurant. Wooten v. Moore, 400 F.2d 239, 241-42 (4th Cir. 1968) cert.denied 393 U.S. 1083.

The doctrine of respondeat superior applies in §1981 claims. Springer v. Seamen, 821 F.2d 871, 881 (1st Cir. 1987). An employee may subject an employer to liability under this doctrine only "'for those intentional wrongs of his employees that are committed in furtherance of the employment; the tortfeasing employee must think (however misguidedly) that he is doing the employer's business in committing the wrong.'" Fitzgerald v. Mountain States Tel. And Tel. Co. 68 F.3d 1257, 1262-63 (10th Cir. 1995). Also, an employer will not be liable under this doctrine unless "'the action complained of was that of a supervisor, authorized to hire, fire, discipline or promote, or at least to participate in or recommend such actions, even though what the supervisor is said to have done violates company policy.'" EEOC v. Gaddis, 733 F.2d 1373,

11

1380 (10th Cir. 1984). Although his reasons for fearing theft and violence grew out of racial stereotyping and illegal racial classification, it is undisputed in this record that Mr. White is the manager of the restaurant and was acting to prevent stealing and protect the safety of the workers he supervised. Therefore, the defendants are responsible for his racially discriminatory behavior.

With regard to the §1981 claim, it is undisputed that Mr. Miller and Mr. Williams are African-American and part of a protected class. Mr. Hallman is also part of the protected class because he suffered discrimination arising out of his association with the other plaintiffs. Fiedler v. Marumsco Christian School, 631 F2d 1144, 1149 (4th Cir. 1980).

The defendants' intent to discriminate is demonstrated in several ways. First, Mr. White's totally unprovoked overreaction to the presence of the plaintiffs in the restaurant indicated that he intended to treat them differently. Next, his deliberate mischaracterization of the plaintiffs as suspicious, when they were engaged in no questionable conduct, raises further strong inferences of intentional discrimination. Mr. White followed took the extreme measure of calling the police, and joining with them to demand prepayment from the plaintiffs. There is highly credible evidence that by taking these steps, Mr. White treated the plaintiffs differently than other customers. Finally, Mr. White explicitly stated his intent to discriminate by explaining that he was essentially holding the plaintiffs accountable for a crime committed by other African-Americans. The prepayment demand and other disparate treatment meant that the plaintiffs were not allowed to contract on the same basis as other Pizza Hut customers solely because of their race. Together, these facts show numerous genuine issues of material fact which should be heard before a jury.

These same facts support the §2000a claim. The defendants have not claimed that the restaurant does not affect commerce or that it is not a public accomodation. This leaves the issue

12

of whether the plaintiffs were denied the full and equal enjoyment of the facility. The plaintiffs were treated differently than other restaurant customers because of their race, and therefore could not fully and equally enjoy the restaurant.

The defendants have also attempted to state a non-discriminatory reason for their shabby treatment of the plaintiffs, that they acted drunk and suspiciously. As demonstrated above, the facts of this case expose Mr. White's story as lacking any basis in reason or logic. Not only is his account internally inconsistent, but it directly and fully contradicts the statements of every other available witness. Mrs. Starnes has left no doubt that the plaintiffs did not act suspiciously or drunk. This, coupled with Mr. White's own admissions regarding the previous black customers, lays bare the reality that the defendants reasons are pretextual.

### C. Defendants Have Not Demonstrated the Absence of any Genuine Issue of Material Fact Regarding the Plaintiffs' Claimed Injuries.

The plaintiffs have clearly articulated injuries that include not only embarrassment and humiliation, but also changes in personal outlook and behavior which arose from this incident and which still affect them today. Price v. City of Charlotte, 93 F.3d 1241 (4th Cir. 1996) makes it clear that "a plaintiff's testimony, standing alone, may support a claim of emotional distress precipitated by a constitutional violation." Id., at 1251. Such a claim may give rise to a compensatory damage award. A reasonable jury could easily draw an inference from the testimony presented here that the plaintiffs' injuries are concrete and compensable.

### D. Defendants Have Not Demonstrated the Absence of Any Genuine Issue of Material Fact Regarding the Plaintiffs' Claim for Punitive Damages.

It is well established that "[p]unitive damages are recoverable for conduct exhibiting malice, an evil motive, or recklessness or callous indifference to a federally protected right." Stephens v. South Atlantic Canners, Inc., 848 F.2d 484 (4th Cir. 1988). Mr. White's conduct

13

would have been merely discriminatory and illegal if he had simply come to the plaintiffs himself, and requested that they prepay for food based on the criminal activities of unrelated third parties. Instead, he allowed the plaintiffs to wait on their pizza while he commanded Mrs. Starnes to call the police.

It is clear from the record that the plaintiffs waited a considerable amount of time for their pizza before the police arrived. During that wait, the plaintiffs remained polite and patient, and never even left their table in order to question Mr. White about the delay. Given this situation, Mr. White should have turned the police officers away when they arrived, and informed them that there was no problem. Instead, he pressed on with his ill-fated plan and accosted the plaintiffs. It is the deliberate use of the police officers to harass innocent individuals like the plaintiffs, in spite of overwhelming information weighing against that course of action, that must be punished. These facts more than demonstrate an inference of callous indifference on Mr. White's part for the plaintiffs' federally protected rights.

Furthermore, there is no indication in this record that Mr. White received even a simple reprimand from the defendants for his outrageous behavior. According to him, he simply talked with a higher level manager and remained employed in the same manner by the defendants. White Dep. pp.33-35. The astounding argument set forth by the defendants, that Mr. Hallman is somehow a better person for having suffered through invidious discrimination, and admits this to be true, further indicates their reckless indifference to the plaintiffs' rights. Defendants' Memo. pp.6-7.

In their Memorandum, the defendants cite Stephens, supra, and Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (4th Cir. 1998), two cases in which punitive damages awards made in trial courts were reversed. Defendants' Memo p.22. A close reading of the facts of those cases

14

reveals that the plaintiffs in the cases both were partially responsible, through their own actions, for the hardships that led them to file suit. Here, in contrast, the plaintiffs are entirely blameless. A reasonable jury could award punitive damages to the plaintiffs in this matter, and should be allowed to do so if appropriate.

## VI. CONCLUSION

The defendants have failed to show the absence of a genuine issue of material fact as to the plaintiffs' discrimination and compensatory and punitive damages claims. Therefore, the Court should deny summary judgment on all issues addressed here.

This the 9th day of June, 1999.

_____
James E. "Jay" Ferguson, III
Ferguson, Stein, Wallas, Adkins,
Gresham & Sumter, P. A.
741 Kenilworth Avenue, Suite 300
Charlotte, North Carolina 28204
Telephone: 7040375-8361
N. C. Bar No.: 22054

## CERTIFICATE OF SERVICE

I certify that I have served the foregoing on opposing counsel by placing a copy thereof enclosed in a first-class, postage-prepaid, properly-addressed wrapper in a post office or official depository under the exclusive care and custody of the United States Postal Service, addressed to:

>Mr. John Taylor
>Robinson & Lawing, LLP
>370 Knollwood Street, Suite 600
>Winston-Salem, North Carolina 27103

This the 9th day of June, 1999.

_____
James E. "Jay" Ferguson, III
Ferguson, Stein, Wallas, Adkins,
 Gresham & Sumter, P. A.
741 Kenilworth Avenue, Suite 300
Charlotte, North Carolina 28204
Telephone: 704-375-8461

16

Case 5:98-cv-00019-HM   Document 32   Filed 06/09/99   Page 16 of 17

# NOTE:

# THIS IS A PARTIALLY SCANNED DOCUMENT.

# PLEASE SEE THE CASE FILE FOR ATTACHMENTS, EXHIBITS, AFFIDAVITS OR OTHER MATERIAL WHICH HAS NOT BEEN SCANNED.