UNITED STATES DISTRICT COURT
WESTERN DISTRICT NORTH CAROLINA
STATESVILLE DIVISION
CIV. NO. 5:98-CV-19-MCK

| | | |
|---|---|---|
| CLAY HALLMAN, DEREK MILLER and CHRISTOPHER WILLIAMS, | ) ) ) | |
| Plaintiffs, | ) ) | **REPLY MEMORANDUM** |
| v. | ) ) | **IN SUPPORT OF** **DEFENDANTS' MOTION** |
| RAGE, INC., and PIZZA HUT OF HICKORY NO. 2, INC., | ) ) ) | **FOR SUMMARY JUDGMENT** |
| Defendants. | ) ) ) | |

## INTRODUCTION

This matter is before the Court on the Motion of defendants Rage, Inc. ("Rage") and

Pizza Hut of Hickory, No. 2, Inc. ("Pizza Hut"), for Summary Judgment (filed and served on

May 10, 1999). Plaintiffs, without opposition from defendants, obtained an order extending

the time to respond until June 8, 1999, but served their Response on June 9, 1999. Defendants

submit this Reply Memorandum in support of the Motion.

## DISCUSSION

### I.     Plaintiffs Have Not Demonstrated a *Prima Facie* Case of Discrimination.

To establish a claim under 42 U.S.C. § 1981 or 2000a, a plaintiff must prove a prima

facie case of intentional discrimination. Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047

(5th Cir. 1996). Plaintiffs have produced no evidence of intentional discrimination.

The Affidavit of Lisa Starnes, submitted with plaintiffs' Response, contains nothing

showing that Mr. White acted with discriminatory intent. The Affidavit simply states that Mr.



White appeared nervous, that he instructed Ms. Starnes to call the police, and that he asked plaintiffs to prepay for their food. Nothing in the Affidavit suggests that Mr. White intended to discriminate. In fact, the Affidavit indicates the absence of any conduct or pattern that might show discriminatory intent when it states that Mr. White never called the police or made a request to prepay in connection with black customers. Starnes Affidavit, ¶ 16. Plaintiffs have no evidence of intentional discrimination other than their own personal opinion and speculation, which is insufficient to establish a prima facie case. See, Martin v. Airborne Express, 16 F.Supp.2d 623 (E.D.N.C. 1996), aff'd, 155 F.3d 559 (4th Cir. 1998).

In their attempt to demonstrate purposeful discrimination, plaintiffs mischaracterize the testimony of David Coats. Although Mr. Coats testified that he thought the incident was unfortunate and "wrong" (Coats Dep., pp. 33, 48), he specifically testified that he did not feel that Mr. White's conduct was racially discriminatory. (Coats Dep., pp. 48-50) (For convenience, the cited pages of Mr. Coats' deposition are attached as Exhibit A). He testified that the incident did not occur "because [he is] black," but because of comments the plaintiffs made about "getting something for free." He further testified that the incident "could have happened to anybody," and that he did not pursue a lawsuit because he "didn't think nothing (sic) else about it," even though he was free to look for another lawyer if he had wanted to. (Coats Dep., pp. 12, 33, 44-47, 55-56).

Finally, as demonstrated in the Supplemental Affidavit of Lisa Starnes, given the circumstances, Mr. White had justification for being nervous–specifically, a nearby Pizza Hut had recently been robbed and its manager shot. (See, Supplemental Starnes Affidavit, ¶ 4,

2

attached hereto as Exhibit B).[1]  Whether Mr. White's reaction was ultimately appropriate, the incident at the nearby Pizza Hut represents a legitimate reason for his concern over the safety of himself and his employee and shows that his conduct was not racially motivated.  (See White Dep., pp. 8-9; Supplemental Starnes Affidavit, ¶ 3, 4) (Cited pages from Mr. White's deposition are attached as Exhibit C).

The record evidence fails to demonstrate any discriminatory intent on the part of Mr. White.  Plaintiffs cannot establish a prima facie case of purposeful, intentional discrimination, nor can they overcome the legitimate business reason for Mr. White's conduct, which was not related to plaintiffs' race.

## II.    Plaintiffs Have Failed to Produce Evidence of Any Compensable Injury.

None of the plaintiffs testified to the type of actual injury that is actionable under § 1981 or 2000a.  Mr. Williams' testimony of injury boils down to increased suspicion of whites.  (Williams Dep., pp. 55-56) (Attached as Exhibit D).  Mr. Miller was not even paying attention when the police were at the table.  (Miller Dep., pp. 159-160) (Attached as Exhibit E).  Mr. Hallman's claimed injury is essentially that he now makes a greater effort not to discriminate.  (Hallman Dep. p. 60) (Attached as Exhibit F).

If any plaintiff is deemed to claim an injury that is recognized under either statute, there is no evidence of such injury other than speculative and conclusory testimony that is substantively identical to testimony that was held to be insufficient in Price v. City of

---

[1]Pursuant to Rule 56(e), defendants respectfully request that the Court accept the attached Affidavit of Ms. Starnes in supplementation of the affidavit previously submitted in conjunction with plaintiffs' Response.

3

<u>Charlotte</u>, 93 F.3d 1241 (4th Cir. 1996).

> . . . A plaintiff's testimony, standing alone, can support an award
> of compensatory damages for emotional distress based on a
> constitutional violation; however, the testimony must establish
> that the plaintiff suffered demonstrable emotional distress, which
> must be sufficiently articulated; neither conclusory statements that
> the plaintiff suffered emotional distress nor the mere fact that a
> constitutional violation occurred supports an award of
> compensatory damages. In marshaling the evidence necessary to
> establish emotional distress resulting from a constitutional
> violation, . . . 'genuine injury' is necessary.

<u>Price</u>, 93 F.3d at 1254. Even if any plaintiff claims actual injury that is actionable under either

statute, no reasonable jury could find, based upon the evidence of record, that he is entitled to

more than nominal damages.

III.    **Plaintiffs Have Failed to Produce Evidence Justifying Punitive Damages.**

Plaintiffs' Response asserts two bases for their punitive damages claim. First, plaintiffs

argue that Mr. White received no reprimand whatsoever for his conduct. To the contrary, the

evidence indicates that Mr. White had two discussions with supervisors about the incident.

(White Dep., pp. 33-34) (Exhibit C). No evidence supports plaintiffs' speculation that these

conferences did not involve reprimands. To the contrary, the evidence indicates that, before

plaintiffs left the restaurant, Mr. White had talked to his supervisor and was instructed by his

supervisor to return to the table and offer their money back. (Williams Dep., p. 40) (Exhibit

D).

As a second basis for their punitive damages claim, plaintiffs cite an argument

presented by defense counsel in support of the Motion for Summary Judgment. Plaintiffs'

punitive damages claim arises out of Mr. White's alleged conduct that occurred over four years

4

ago–an argument by counsel contained in a legal memorandum is not an appropriate basis for awarding punitive damages. Because plaintiffs have presented no evidence to support a punitive damages claim, the claim should be dismissed.

## IV. Plaintiffs Have Abandoned Their Claims Against Rage.

Plaintiffs' Response fails to address the portion of the Motion for Summary Judgment seeking a dismissal of the claims against Rage. Given that plaintiffs have thus abandoned their claims against Rage, their claims against Rage should be dismissed.

## CONCLUSION

Based on the foregoing arguments and authorities, and based on the materials submitted in support of defendants' Motion for Summary Judgment, Defendants Rage, Inc. and Pizza Hut of Hickory No. 2, Inc. respectfully request that Summary Judgment be granted in their favor as to all claims by plaintiffs in this action or, in the alternative, that Summary Judgment be granted dismissing plaintiffs' claims for punitive damages and dismissing the claims asserted against Rage.

RESPECTFULLY SUBMITTED this the 15th day of June, 1999.

_Norwood Robinson_
Gray Robinson
John N. Taylor, Jr.
Attorneys for Defendants

OF COUNSEL:

ROBINSON & LAWING, L.L.P.
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: (336) 631-8500
Telecopy: (336) 631-6999

5

## CERTIFICATE OF SERVICE

I, John N. Taylor, Jr., hereby certify that on this date I served a copy of the foregoing

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR**

**SUMMARY JUDGMENT** upon all counsel of record by placing a copy of the same in the

United States mail in a prepaid envelope addressed as follows:

> Jay Ferguson, Esq.
> Ferguson Stein, et al
> Suite 300 Park Plaza Building
> 741 Kenilworth Avenue
> P.O. Box 36486
> Charlotte, NC 28236-6486

This the ___15th___ day of June, 1999.


John N. Taylor, Jr.
Attorney for Defendants

OF COUNSEL:

ROBINSON & LAWING, L.L.P.
370 Knollwood Street, Suite 600
Winston-Salem, North Carolina 27103-1835
Telephone: (336) 631-8500
Telecopy: (336) 631-6999

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

JASMYNE AND PATRICK BOBBITT,  )
JUNIOR, by their next friends )
ALISA and PATRICK BOBBITT,    )
SENIOR, et al,                )
                              )
          Plaintiffs,         )
                              )        Civil Action #5:98CV19-McK
     -vs-                      )
                              )
RAGE, INC., et al,            )
                              )
          Defendants.         )
_____  )

1:59 P.M.
March 1, 1999
Charlotte, North Carolina



DEPOSITION

OF

DAVID BERNARD COATS

Charlotte Court Reporting, Inc.
Post Office Box 11629
Charlotte, North Carolina 28220
(704) 373-0347
Toll Free (800) 456-9424

1   A.   Yeah.

2   Q.   Approximately how long was it after the Hickory

3        incidence occurred that you moved to Rock Hill?

4   A.   Oh, that's been -- that's been a while.  I mean, I had

5        -- we didn't -- after -- I guess -- when we went to go

6        see the lawyer, the lawyer told us that it was just a

7        misunderstanding, basically what he said and that he

8        don't feel that it was a discrimination.  So, I mean,

9        that was that and the other guys was talking about they

10       still was going to try to see it further, but that was

11       the last time that, you know, I really talked with them

12       any, you know, about it any more.

13  Q.   So after -- is it fair to say, then, that after you

14       went to see that first lawyer and he told you what he

15       told you, you just decided to go on with your life and

16       put it behind you?

17  A.   I didn't think nothing else about it, being truthful.

18  Q.   All right.  Do you have in your possession either here

19       or at home or at work, anywhere at all, any notes or

20       documents --

21  A.   No.

22  Q.   -- or anything regarding the incident at the Pizza Hut

23       or this lawsuit?

24  A.   No.

25  Q.   Okay.  I think I know the answer to this question

1  Q.  Okay.

2  A.  -- to my house.

3  Q.  I see.  Okay.

4  A.  I mean, I don't have nothing wrong with the food or

5      nothing like that.

6  Q.  You don't have a problem with eating --

7  A.  I don't have a problem --

8  Q.  -- their food or anything like that?

9  A.  No.  It ain't nothing like that.  It's just -- it's

10     just what happened, it was wrong.

11  Q.  Right.

12  A.  It was wrong what happened.

13  Q.  Okay.  It's just kind of an unfortunate event and you

14     -- you, for your purposes, you've just kind of gone on

15     past it?

16  A.  I mean, basically, yes.

17              MR. TAYLOR:  Okay.  Thank you very much.

18              That's all I have.  Mr. Ferguson might

19              have some questions for you.  I

20              appreciate your time.

21              THE WITNESS:  All right.  Thank you.

22  E X A M I N A T I O N  (By Mr. Ferguson):

23  Q.  I do have a few questions for you, Mr. Coats.  As Mr.

24     Taylor said, I represent Chris Williams and Clay

25     Hallman and Derek Miller in a lawsuit that we did

1   A.   I guess that probably something to show them apology or

2        something.

3   Q.   Why do you think this whole incident at the Hickory

4        Pizza Hut that day happened the way that it did?

5             MR. TAYLOR:   Objection.

6   A.   I don't know.  I, basically, think because it was --

7        well, I, basically, think because it was four guys

8        sitting in there.  We was all in there by ourself,

9        which, I mean, I didn't see nothing really wrong with

10       it, but I guess it's just one of them things that just

11       happened.  Three black guys in there and one white.  I

12       mean, I didn't really see nothing wrong with it anyway,

13       but I don't know why it happened.

14  Q.   Now, you mentioned three black guys and one white guy

15       sitting there.  Do you think that that had anything to

16       do with the whole situation?

17  A.   I don't think that had anything to do with it.  I mean,

18       the reason why, personally, I think that the police was

19       called because the guy said, "What can we get free

20       today," which was a joke and he told the girl that.  It

21       was -- he was just kidding.  So I -- she might have got

22       scared herself.  I mean, I don't know.  She might have

23       got scared.  That's the reason I think why the whole

24       thing happened like it happened, which we told the girl

25       -- he told the girl that he was just kidding -- kidding

1    with her and -- and we -- like I say, she'd stand over

2    there before she even, you know took our -- got our

3    over and everything. We was all sitting over there

4    with her talking and laughing. I mean, I didn't think

5    nothing like that was going to happen myself.

6  Q.  Do you think that the same thing would have happened if

7    it had been three black women and one white woman

8    sitting there?

9         MR. TAYLOR: Well, objection.

10  A.  I don't know. I don't know. I -- you know, it really

11    don't make a difference who -- you know, who there. I

12    mean, the point is the guy said, you know, he was just

13    kidding. She probably took it as the wrong way that --

14    that we was going to try to get free pizza or something

15    like that or wasn't going to pay for it. That's

16    probably how she took it and she might have -- she

17    might have got scared. I don't know, but all I do know

18    that that waitress, when she got our order, she went up

19    there to the manager and gave that manager our order,

20    it wasn't a few minutes later the police was there.

21    And that might be why everything happened like it did

22    at that point because what one of the guys had said.

23  Q.  You think this could have happened to anybody?

24  A.  Could have.

25         MR. FERGUSON: I don't have anything else.

1  F U R T H E R   E X A M I N A T I O N  (By Mr. Taylor):

2  Q.  I just have a couple more, Mr. Coats, just to follow up

3      on a couple things Mr. Ferguson asked you about.  You

4      -- when you first started answering Mr. Ferguson's

5      questions, you talked about there had been occasions

6      when you had been walking around a store and the people

7      in the store might follow you around and I wrote down

8      what you said.  You said, "On occasion I have told them

9      what are you doing following me, I've got money in my

10     pocket to pay for something."  Is that something that

11     has happened to you before or not?

12 A.  It ain't never happened to me.  I was just making an

13     example.

14 Q.  I got you.  I just wanted to make sure I understood.

15 A.  Yeah.

16 Q.  But you did say it's something that happened to your

17     sister?

18 A.  It happened to my sister before.

19 Q.  And you described that for Mr. Ferguson?

20 A.  Yeah.

21 Q.  I just want to ask you, after that happened to your

22     sister, did your sister pursue a lawsuit?

23 A.  No.

24 Q.  Okay.  All right.  And you've told us in some detail

25     about going to see the lawyer.

1  A.    Yeah.

2  Q.    And then you've explained to us why you didn't go see

3        another lawyer.

4  A.    Yeah.

5  Q.    My question is there wasn't anything that really

6        prevented you from going to see another lawyer, was

7        there?  I mean, if you had wanted to, you could have

8        found another lawyer to go see, couldn't you?

9  A.    Yeah.

10  Q.    Okay.  Did I understand your testimony correctly to be

11        that before you fellows left the Pizza Hut restaurant

12        y'all were already talking about going to see a lawyer?

13  A.    Yes.

14  Q.    Whose idea was that?

15  A.    I don't know.

16  Q.    Okay.  All right.  You've testified in response to one

17        of Mr. Ferguson's questions about these gift

18        certificates and I believe, if I recall correctly, your

19        testimony was that you thought they had been sent to

20        show an apology from Pizza Hut.  Do you think that that

21        was a good thing for Pizza Hut to do, to send these out

22        as a way of apologizing?  Was that a good thing for the

23        company to do?

24  A.    Yeah.  I mean, any good thing to do, like, if -- it's

25        just like if -- it's just like, for another example,

1        it's just like if -- if you do something wrong to

2        somebody or you to try to apologize in a nice way and

3        that probably was Pizza Hut's nice way trying to

4        apologize, to send gift certificates.

5   Q.   Okay.  And so you'd agree with me that was a good

6        gesture for them to make?

7   A.   Yeah.

8                MR. TAYLOR:  That's all I have.  Thank you.

9                MR. FERGUSON:  I do have just one more.  I

10               think it's one more.

11  F U R T H E R   E X A M I N A T I O N  (By Mr. Ferguson):

12  Q.   Going back to you-all talking about maybe going to see

13       a lawyer that same day, you having that conversation

14       with the rest of the guys, --

15  A.   Uh-huh.

16  Q.   -- what made y'all think that you might have a lawsuit

17       that you could bring?

18               MR. TAYLOR:  Object to the form.

19  A.   We all feel -- we all felt that that was wrong for what

20       they had did, calling the police on us and we all felt

21       that we had been discriminated against, so we all

22       decided to go see a lawyer.

23  Q.   When you say discriminated against, what exactly do you

24       mean?  I mean, discriminated how?  Discriminated why?

25  A.   I mean, just like someone -- it's just like someone

1   taking something away from you because -- I mean, we

2   was the only one in there.  I can't say, you know, why

3   the police was there.  I mean, that was all like we was

4   going to steal something.  Of course, anyone would feel

5   hurt and real upset.  I was real upset.  I -- really, I

6   didn't even want to eat after all that happened.  I sat

7   there because, you know, I was the driver and the other

8   guys wanted to eat, go ahead and eat.  I was ready to

9   go, basically and truly, because me personally, we all

10  just should have walked out after the police told us to

11  leave the premises and, I mean, make everything, you

12  know, right or, you know, just -- just we all just

13  should have just left and just left it alone.

14  Q.  When you say discriminate, do you mean to be treated

15      differently than somebody else?

16          MR. TAYLOR:  Object to the form.

17  A.  No; I ain't going to say treated different.  Well,

18      basically, I think that we was treated wrong and it

19      hurted me, really.  It hurted me and I had a lot of

20      anger.  I mean, I wanted to -- being truthful, I wanted

21      to really just really curse someone out, but I just --

22      like I said, I didn't say anything.  I just kept quiet

23      and then when all us got ready to leave, was getting

24      ready to go up there and leave and stuff, I think, I

25      can't recall if it was afterwards, before we went out

1     the door that Chris made that phone call, but all us

2     was up there talking and we all said that man, that's

3     messed up. We need to do something about this, calling

4     the police on somebody. We -- I mean, we said it loud.

5     We said it loud so they can hear it and we all got

6     pretty hype there and we just went on out -- went on

7     out the door.

8  Q.  Would you say that the way y'all were feeling and

9     talking on your way out of the Pizza Hut was different

10    from the way that you were feeling and talking when you

11    came in?

12         MR. TAYLOR: Objection.

13  A.  I mean, when we came in everybody was happy. I mean,

14    we was coming there to get something to eat and we all

15    was laughing and talking, having fun and then, you

16    know, when the police came, when he called the -- we

17    didn't even know the police was even coming from the

18    first place and when they came in there and told us we

19    going to have to leave the premises, Chris said, "For

20    what? What we done?" And they started telling -- the

21    manager -- I believe the office, one of the police

22    officers, called the manager over there and he came

23    over there on his own and he started saying something.

24    I can't remember everything what happened, but I didn't

25    say nothing. And everybody just wanted to go ahead and

1    the street and pay them the same amount of money that

2    this guy making now and then after he be there a month

3    or two he making more money than that guy making.

4    That's wrong, which it is.

5  Q.   Do you feel that what you're describing right there is

6       different from or like the situation that happened out

7       in Hickory at the Pizza Hut?

8            MR. TAYLOR:  Objection.

9  A.   Same thing.  It's wrong.  It's the same thing.  It's

10      wrong.  Basically and truly, it's just wrong for what

11      they did.  They didn't have to call the police on

12      nobody.  If they felt that that was wrong for what one

13      of the guys said, she should have -- she should have, I

14      mean, just came out and just told him rather than

15      putting the police involved or something like that.  I

16      mean, personally, if I feel that if someone -- well,

17      it's just like if I hurted someone's feelings or

18      something or someone was talking about it, I'd rather

19      for that person to be a man or be a woman, to come in

20      and tell me theirself what I did or if I done something

21      wrong.  Come tell me.  It's just like don't talk behind

22      my back or something.  Tell me about the situation,

23      then if I done something wrong, I'll apologize to you.

24      I mean, that goes with anybody.  Anybody can be hurt.

25  Q.   So now to make sure I'm real clear on this, the

1      situation you were talking about on your job, you said

2      you felt like that did have something to do with the

3      fact that you're black?

4  A.   Yeah.

5  Q.   And then when I asked you whether you felt like that

6      situation was mostly the same or different than what

7      happened out at the Hickory Pizza Hut, you said it was

8      basically the same.

9  A.   Well, I ain't --

10                 MR. TAYLOR:  Objection.

11 A.   I ain't going to -- I'm saying this point on from -- I

12      ain't going to say it was like that because I'm black

13      -- because I'm black, because it was a -- it was three

14      black guys and a white -- a white person there with us.

15      I ain't going to say that.  I'm just saying that just

16      wrong for what happened and what they did.  They

17      shouldn't have called the police on us.  I felt that

18      that was wrong, you know.  I felt that -- I mean, it

19      was very -- made me very upset and it hurted me.  I

20      mean, I felt that was wrong.  I'm going to put it to

21      you like that.

22 Q.   So they were both wrong, but you felt like they were

23      different types of situations?

24                 MR. TAYLOR:  Object to the form.

25 A.   Yeah.

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT NORTH CAROLINA
### STATESVILLE DIVISION
#### 5:98CV19-McK

CLAY HALLMAN, DERRICK MILLER )
and CHRISTOPHER WILLIAMS, )
                                )
                   Plaintiffs, )
                                )
v. )
                                )
RAGE, INC., and )
PIZZA HUT OF HICKORY NO. 2, INC., )
                                )
                   Defendants. )
                                )
                                )

---

## AFFIDAVIT OF LISA STARNES

Lisa Starnes, being first duly sworn, deposes and states as follows:

1.    I am above the age of majority, of sound mind and make this affidavit upon my own personal knowledge.

2.    I was employed as a waitress by Pizza Hut of Hickory No. 2, Inc. on March 2, 1995.

3.    I recall that, on or about that date, three black men and one white man came in the back door of the Pizza Hut. I approached them, asked them if they wanted to eat, and showed them to a booth. They were making comments about getting "free food" and asked me what they could "get for free." They ordered a pitcher of beer.

4.    Shortly prior to this incident, a nearby Pizza Hut was robbed and the manager was shot. This, together with the conduct of the four individuals, made the manager on duty nervous. He asked me to call the police. In hindsight, he may have over-reacted, but based on the circumstances, he was understandably nervous and concerned for our safety.

5.    After the police departed, the four individuals ate their pizza in the restaurant, left me a tip, and left.

6.    Given the circumstances, the manager would have reacted in the same way no matter what race the four individuals were. There was no intent to discriminate against the



four individuals by the manager or by me.

This the 2 day of June, 1999.

_Lisa Starnes_
Lisa Starnes

Sworn to and subscribed before me
this the 2 day of June, 1999.

_Debra N. Mathis_
Notary Public

My Commission Expires: 11-9-2003

UNITED STATES DISTRICT COURT
WESTERN DISTRICT NORTH CAROLINA
STATESVILLE DIVISION

```
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                              )
CLAY HALLMAN, DERRICK MILLER  )
and CHRISTOPHER WILLIAMS,     )
                              )
           Plaintiffs,        )
                              )
     -vs-                     )        Civil Action
                              )
RAGE, INC., and PIZZA HUT OF  )        No. 5:98-CV-19-MCK
HICKORY NO. 2, INC.,          )
                              )
           Defendants.        )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )
```

The Deposition of LOUIS WHITE

taken before me, Cheryl L. James, CSR-5786, a Notary

Public within and for the County of Wayne, State of

Michigan, at 8600 Merriman Road, Romulus, Michigan, on

Friday, April 9, 1999.


APPEARANCES:

        FERGUSON, STEIN, WALLAS,
        ADKINS, GRESHAM & SUMTER, P.A.
        741 Kenilworth Avenue, Suite #300
        Charlotte, North Carolina  28204
            (By Jay Ferguson, Esq.),

                Appearing on behalf of Plaintiffs,

        ROBINSON & LAWING, L.L.P.
        370 Knollwood Street, Suite #600
        Winston-Salem, North Carolina  27103-1835
            (By John N. Taylor, Jr., Esq.),

                Appearing on behalf of Defendants.

*Penobscot Building*
*Suite 2200*
*Detroit, Michigan 48226*

**Luzod Reporting Service**
*962-1176*

*30903 Northwestern Hwy.*
*Suite 100*
*Farmington Hills, Michigan 48018*

```
 1  A.    (Interposing)  In the back, right.

 2  Q.    So, as far as the front was concerned, it was you

 3        and the waitress?

 4  A.    Right.

 5  Q.    And can you tell me whether or not -- strike that.

 6        Why was it -- did you say that you had the police

 7        contacted?

 8  A.    Yes.

 9  Q.    Can you tell me why it was that you did that?

10  A.    They were just -- they were really rude.  They were

11        -- they appeared to me to be drunk and, you know, I

12        was afraid of something happening with just us

13        being in the restaurant.

14  Q.    Had there been any incidents at any other

15        Pizza Huts nearby in the time before that that

16        caused you to feel any axiety?

17  A.    Yeah.  Now, as far as dates I can't be specific,

18        but I would say on average of two weeks there was a

19        manager that was shot, and that was at Hickory 1,

20        which is, like, down the street, maybe about two

21        miles.

22  Q.    And so the reason why you called the police was

23        simply because you were concerned by their conduct

24        and you just simply had concern for your safety?

25  A.    Safety, yes, definitely.
```

*Penobscot Building*                **Luzod** *Reporting Service*        *30903 Northwestern Hwy.*
*Suite 2200*                              *9 6 2 - 1 1 7 6*                              *Suite 100*
*Detroit, Michigan 48226*                                        *Farmington Hills, Michigan 48018*

1  Q.   Was there any intention on your part to
2       discriminate?
3  A.   No, none whatsoever.  I've never been a
4       discriminating person, and just for the record, I'm
5       a gay white male and I put up with discrimination
6       every day of my life, and I don't believe in it and
7       I don't tolerate it.  It's wrong.  It's not right
8       just because of a person's color or whatever
9       lifestyle they choose in life.
10 Q.   Was there any discrimination on that date by you or
11      any of your staff?
12 A.   No, none, none whatsoever.  You know, that's just
13      not tolerated in the work industry or in the
14      restaurant industry, and just personally it's not
15      right.
16           MR. TAYLOR:  Jay, that's all I have
17      at the moment.
18           MR. FERGUSON:  Okay.  Mr. White, as
19      Mr. Taylor said, I'm representing the plaintiffs in
20      this matter.  Those are three of the gentlemen who
21      were there in the restaurant that day that, as you
22      say, you saw.
23           I just want to take you back through
24      the events in a little bit more detail and
25      hopefully you can remember that.

9

*Penobscot Building*
*Suite 2200*
**Luzod Reporting Service**
*962-1176*
*30903 Northwestern Hwy.*
*Suite 100*

Case 5:98-cv-00019-HM   Document 33   Filed 06/15/99   Page 23 of 34

```
 1          call the police, I'm not arguing with these people.
 2    Q.    How quickly did they leave after you said that?
 3    A.    Within minutes.
 4    Q.    Did -- and then you said that the police actually
 5          came?
 6    A.    Yes.
 7    Q.    You talked to them?
 8    A.    Yes.
 9    Q.    Did they take a report that you recall?
10    A.    I don't think so.  I don't -- I don't know, you
11          know what I mean.  They didn't fill out anything.
12          I just told them what happened and they left.
13    Q.    Do you know whether or not they went after these
14          four gentlemen?
15    A.    I have no idea.
16    Q.    You ever talk to those officers again or get any
17          kind of follow-up report?
18    A.    No.
19    Q.    Who else did you - well, what happened after that,
20          after the police left?
21    A.    Nothing.  It was -- as far as I was concerned it
22          was over.
23    Q.    You ever talk to your supervisor about the
24          situation?
25    A.    Yes, I did, and he asked me what happened and I
```

Penobscot Building
Suite 2200
Detroit, Michigan 48226

**Luzod Reporting Service**
962-1176

30903 Northwestern Hwy.
Suite 100
Farmington Hills, Michigan 48018

Case 5:98-cv-00019-HM   Document 33   Filed 06/15/99   Page 24 of 34

```
 1        told him what happened and that was the end of it.

 2   Q.   Was your supervisor the only other person connected

 3        with that Pizza Hut that you talked to about this

 4        situation?

 5   A.   No.  I talked to Don Pollin (ph) -- I think that's

 6        how you pronounce his name -- about it, who was

 7        somebody at the main office.

 8   Q.   When did you talk to him?

 9   A.   Oh, God, maybe a week or two afterwards.

10   Q.   What was your conversation with him?

11   A.   Basically the same thing with my supervisor.  He

12        asked me what happened and I told him what

13        happened.

14   Q.   How long after this situation did you stop working

15        at that Pizza Hut?

16   A.   God, I don't -- I left there and I went up to the

17        one in Ashville, I think -- not Ashville.  God.

18        It's up in the mountains, and I worked there for a

19        while and then I left the company.

20   Q.   Why did you leave the Pizza Hut in Hickory the

21        second time, this last time?

22   A.   Oh.  There was a store up in the mountains that

23        they -- it was a trouble store and they needed some

24        help up there, because I am a really good

25        troubleshooter, go in and straighten out a store,
```

*Penobscot Building*
*Suite 2200*
*Detroit, Michigan 48226*

**Luzod Reporting Service**
*962-1176*

*30903 Northwestern Hwy.*
*Suite 100*
*Farmington Hills, Michigan 48018*

Case 5:98-cv-00019-HM   Document 33   Filed 06/15/99   Page 25 of 34

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION


JASMYNE AND PATRICK BOBBITT,    )
JUNIOR, by their next friends   )
ALISA and PATRICK BOBBITT,      )
SENIOR, et al,                  )
                                )
            Plaintiffs,         )
                                )
      -vs-                      )    Civil Action #5:98CV19-McK
                                )
RAGE, INC., et al,              )
                                )
            Defendants.         )
_____  )

12:34 P.M.
December 15, 1998
Charlotte, North Carolina





DEPOSITION

OF

CHRISTOPHER DALE WILLIAMS

Charlotte Court Reporting, Inc.
Post Office Box 11629
Charlotte, North Carolina 28220
(704) 373-0347
Toll Free (800) 456-9424

1   A.   See, he started cooking the pizza and we started

2         eating, so it's about twenty minutes had lapsed.  About

3         ten or twenty minutes.

4   Q.   All right.  And how long was it from the time you

5         placed your telephone call to the time that the manager

6         came back to your table and asked who was Christopher

7         Williams?

8   A.   That's the same question.  Ten or twenty minutes.

9   Q.   Okay.  Well, I wasn't -- I didn't know whether you had

10        understood my question or not.  So the time between the

11        time you placed the telephone call complaining about

12        your service to the time Pizza Hut, the supervisor,

13        called him back was something less than twenty minutes?

14        Between ten and twenty minutes is your testimony?

15   A.   Yes, sir; yeah.

16   Q.   And the manager was apologetic, wasn't he?

17   A.   No.  At first he was like -- no.  He didn't really,

18        like, apologize.  He just said, "Here's your money

19        back," you know.  "You can have the pizza on us, sir."

20        But the guy, Don Pollan, said, you know, he was sorry

21        it happened to us, but it was just a bad judgment call

22        on his manager, you know.

23   Q.   Well, Mr. Pollan apologized to you?

24   A.   Yeah.

25   Q.   All right.  And the -- and they offered to let you eat

1    there's nothing else that you contend you've been --

2    how you've been injured other than what you just said?

3  A.  Suffered loss as money wise or something?

4  Q.  In any way.  Well, let's break it down.  Have you been

5    injured financially in any way?

6  A.  No.

7  Q.  All right.  And other than what you've just explained

8    to me, is there anything else that you contend that

9    you've been -- incurred any loss or damage?

10 A.  Getting moved up on my job, you know, other than that.

11   'Cause when I -- after I complained about that incident

12   and had the man fired, his -- his friend is a other

13   department manager was supposed to give -- was

14   interviewing me for another job to move up and I was a

15   shoo-in for it.  I mean, best work record, the only one

16   that been doing it, and he went around me and put

17   someone else in.

18 Q.  I'm sorry, sir.  I didn't understand that.  Are you

19   talking about something that happened at Armstrong?

20 A.  No, sir; PYA.  This is after -- this is now at the job

21   I work at now.

22 Q.  And you're -- are you saying that you were passed over

23   by a job by something that Pizza Hut did?

24 A.  I'm saying that for me claiming how racist that man

25   was, his other partner, I will say, or friend, that he

1    brought to that branch was interviewing for a job to go

2    -- to move up, a position, a different position in my

3    job.  And I felt that he wouldn't give it to me 'cause

4    I had his friend, the other manager, fired for racist

5    discrimination reasons.  And see, he wouldn't give it

6    -- he gave to a guy -- he gave it to a white guy that

7    had less experience, hadn't been there long.  I'd been

8    doing the job and the guy hadn't been doing the job and

9    he just -- and, you know, I thought I was a shoo-in for

10   it.  You know, everybody thought I was -- it was going

11   to be me, but this guy gets the job out of the blues.

12   Q.   Okay.  And all of this happened just recently at PYA

13        Monarch; is that correct

14   A.   About two years ago.  About a year ago.

15   Q.   Okay.  All right.  Is there anything else that you

16        contend has damaged you or any loss that you've

17        suffered?

18   A.   Just my perspective on, I guess I'll say, white people,

19        you know.  I used to look at it in different ways.  You

20        know, I used to look at it as friends.  I loved them

21        just as much as I love, you know, my black friends and

22        stuff and, too, and now when -- if I be around, I tend

23        not to, you know, associate with them too much -- that

24        much now or on a buddy-buddy basis, 'cause, you know,

25        things like that starting to occur, you know.  Little

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION


JASMYNE AND PATRICK BOBBITT,      )
JUNIOR, by their next friends     )
ALISA and PATRICK BOBBITT,        )
SENIOR, et al,                    )
                                  )
                Plaintiffs,       )
                                  )
        -vs-                      )        Civil Action #5:98CV19-McK
                                  )
RAGE, INC., et al,                )
                                  )
                Defendants.       )
_____ )


9:06 A.M.
December 15, 1998
Charlotte, North Carolina





DEPOSITION

OF

DEREK BRUCE MILLER

Charlotte Court Reporting, Inc.

Post Office Box 11629
Charlotte, North Carolina 28220
(704) 373-0347
Toll Free (800) 456-9424

1  A.   Yes.

2  Q.   Okay.  Can you describe for me the embarrassment that

3       you felt during the incident?

4  A.   The embarrassment was the officers walking over to us.

5  Q.   Okay.

6  A.   They made it seem like we did something, you know.

7  Q.   Okay.

8  A.   That's the embarrassment.

9  Q.   Anything else?

10  A.   Yeah.  Paying before we ate.  We never had that

11       happened before, you know.  You go anywhere now and you

12       eat before you pay.  I never had that happened.

13  Q.   All right.  Anything else?

14  A.   No.

15  Q.   Would your answer be the same as to the humiliation

16       that you suffered at the Pizza Hut?

17  A.   Humiliation?

18  Q.   Yes.

19  A.   Yes.

20  Q.   Anything else about that incident that caused you

21       embarrassment or humiliation other than what you've

22       described?

23  A.   I was just embarrassed 'cause the officers came over.

24       Now, if the manager would came by himself and said --

25       and explained to us why he did it, it would have been

1       different, but the way he called the police about us,

2       that was embarrassing.

3  Q.   Okay.

4  A.   He didn't do it in a professional way.  I'll put it

5       that way.

6  Q.   All right.  And is it your testimony that there -- he

7       didn't give an explanation as to why he was doing it?

8  A.   No.  I don't remember that.

9  Q.   All right.  And if he had given an explanation, that

10      would have been sufficient for you?

11  A.   I don't know.  I really wasn't paying him no attention.

12  Q.   I guess my question, though, is kind of a hypothetical

13      question.  If the manager had come over and given an

14      explanation --

15  A.   Uh-huh.

16  Q.   -- for doing what he was doing, would that have been --

17      would that have satisfied you in your own mind?

18  A.   No, 'cause I never had it done before, you know.  I

19      don't think the rules are that way, you know, paying

20      first.  Now, if it had happened at any other restaurant

21      where they had to pay first, maybe I would look at it

22      different.  But I never had it done, though.

23  Q.   All right.  Now, your answer in Exhibit Number 1 says

24      that you've suffered embarrassment and humiliation

25      after the incident as well as during the incident.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION


JASMYNE AND PATRICK BOBBITT,      )
JUNIOR, by their next friends     )
ALISA and PATRICK BOBBITT,        )
SENIOR, et al,                    )
                                  )
            Plaintiffs,           )
                                  )
      vs.                         )    Civil Action #5:98CV19-McK
                                  )
RAGE, INC., et al,                )
                                  )
            Defendants.           )
_____)


2:35 P.M.
December 15, 1998
Charlotte, North Carolina





DEPOSITION

OF

TODD CLAYTON HALLMAN

Charlotte Court Reporting, Inc.
Post Office Box 11629
Charlotte, North Carolina 28220
(704) 373-0347
Toll Free (800) 456-9424

1  A.  In their eyes, but not in my own.

2  Q.  You agree that it's better not to be racist than it is

3      to be racist?

4  A.  Yes.

5  Q.  Okay.  And so to the extent that you're less inclined

6      to be racist, whether intentional or unintentional

7      since this occurrence, would you agree with me that

8      you're a better person because of it?

9  A.  In their eyes.  But in my own eyes I'm more or less

10     terrified for myself -- I mean, to -- see, I don't want

11     to be considered as a racist.

12 Q.  Well, is the only reason that you are more sensitive to

13     racial issues and more accommodating of people now

14     because you're scared or is it because you genuinely

15     want to be not racist?

16 A.  Well, it's -- it's like I don't want to be racist, but

17     since the incident I have been prone to make sure I'm

18     not, put more of an effort to -- I just don't want

19     anyone to go through what we went through in any sort

20     of manner.

21 Q.  Okay.  And to the extent that you exercise that effort,

22     you would agree that that's a positive thing, isn't it?

23 A.  I'd assume -- yes.  I'd assume so.

24 Q.  Okay.  Now, we just had a discussion about the impact

25     of this incident on your personal attitude and personal